IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SANOFI-AVENTIS and AVENTIS PHARMACEUTICALS, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civ. No. 03-1083-SLR |
| ADVANCIS PHARMACEUTICAL CORPORATION, | ) ) ) | |
| Defendant. | ) | |

Francis DiGiovanni, Esquire, of Connolly Bove Lodge & Hutz LLP, Wilmington, Delaware. Of Counsel: Jonathan Z. King, Esquire, Richard S. Mandel, Esquire, and Midge M. Hyman, Esquire, of Cowan, Liebowitz, & Latman, P.C., New York, New York. Attorneys for plaintiffs.

Richard D. Kirk, Esquire, of The Bayard Firm, Wilmington, Delaware. Of Counsel: David H. Bamberger, Esquire, Ann K. Ford, Esquire, of DLA Piper Rudnick Gray Cary US LLP, Washington, D.C. Attorneys for defendant.

**OPINION**

September 26 , 2006
Wilmington, Delaware

**ROBINSON, Chief Judge**

# I.   INTRODUCTION

On December 1, 2003, Aventis and Aventis Pharmaceuticals, Inc. filed suit against defendant Advancis Pharmaceutical Corporation, alleging trademark infringement, 15 U.S.C. § 1114; false designation of origin, 15 U.S.C. § 1125(a); federal trademark dilution, 15 U.S.C. § 1125(c); state trademark dilution pursuant to the Delaware Trademark Act, 6 Del. C. § 3313; unfair competition pursuant to the Delaware Uniform Deceptive Trade Practices Act, 6 Del. C. § 2531 et seq.; and common law unfair competition. (D.I. 51)   In addition, plaintiffs seek cancellation of U.S. Trademark Registration No. 2,887,400 for the ADVANCIS mark.[1]  (Id.)   Defendant denied plaintiffs' allegations and counterclaimed, seeking cancellation of plaintiffs' trademark registrations.   (D.I. 52)   The court conducted a bench trial in May 2005.   (D.I. 68-71)   The following constitutes the court's findings of fact and conclusions of law.

# II.   FINDINGS OF FACT

## A.   The Parties

1.   Aventis, a French company, was formed in 1999 through the merger of Hoechst AG and Rhône-Poulenc S.A.   (D.I. 68 at 245)   In December 2004, Aventis merged with Sanofi-Synthelabo to form Sanofi-Aventis, a company based in Paris, France.   (D.I.

---

[1]When referring to the parties' marks, the court will capitalize all letters of the word.  When referring to the companies, only the first letter will be capitalized.

61 at 3) Sanofi-Aventis has been substituted as a plaintiff in this action. (D.I. 66)

2. Plaintiff Aventis Pharmaceuticals, Inc., part of the Sanofi-Aventis Group, is a Delaware corporation with its principal place of business in Bridgewater, New Jersey. (D.I. 61 at 3)

3. Defendant, a Delaware corporation with its principal place of business in Germantown, Maryland, was formed in 1999 by Edward Rudnic. (Id. at 4; D.I. 71 at 740) In October 2003, defendant went public with an initial public stock offering. (Id. at 789)

**B. Plaintiffs' and Defendant's Marks**

4. Plaintiffs own U.S. Trademark Registration Nos. 2,503,413 and 2,787,832 and Application Nos. 79/007,488 and 78/272,624, which all relate to the AVENTIS mark. (D.I. 61 at 3-4) Sanofi-Aventis has also filed a federal trademark application for SANOFI-AVENTIS. (Id. at 4)

5. The AVENTIS name was borrowed from a Hoechst Germany subsidiary. (D.I. 69 at 484-85) Prior to using the mark, several deals were struck by Aventis to ensure exclusive use, including a $2 million transaction with Alaris, the owner of the ADVANTIS mark. (Id. at 484-501; PX 77-79, 83)

6. Plaintiffs are contractually prohibited from using AVENTIS as anything other than a house mark to identify the

2

company. (D.I. 68 at 282-83) The name AVENTIS is intended to suggest innovation, movement, and adventure. (D.I. 69 at 458, 510)

7. The AVENTIS mark consists of a symbol resembling a wheat shaft in front of the word "Aventis." (DX 13, 33) "Aventis" is written in Ocean SansAV font and is in italics. (Id.) The first letter is capitalized, while the rest of the word consists of lower-case letters. (Id.) The slogan, "Our challenge is life," sometimes appears on promotional materials. (Id.)

8. The SANOFI-AVENTIS mark consists of the words "sanofi aventis" in lower case letters and without a hyphen. (DX 81) Above "sanofi aventis" is a design, which consists of a heart and three people dancing. (D.I. 68 at 138; DX 81) Below "sanofi aventis" is a "smile," or curved line. (DX 81) Below the smile is the slogan, "Because health matters." (Id.)

9. Defendant owns U.S. Trademark Registration No. 2,887,400 and Application Nos. 76/513,925, 76/513,926, 76/513,224, and 76/291,066, which all relate to the ADVANCIS mark. (D.I. 61 at 5) Defendant has used or intends to use ADVANCIS as a trade name to identify the company, as a service mark for drug research and development, and as a trademark for use on pharmaceutical products. (Id.)

3

10. Defendant was initially named Advanced Pharmaceutical Systems, Inc. (D.I. 71 at 740; DX 101) Shortly after the company was formed, defendant's name was shortened to Advanced Pharma, Inc. (D.I. 71 at 740-41; DX 101) In September 2001, defendant changed its name to Advancis Pharmaceutical Corporation ("Advancis") after defendant became aware of a nutritional drug company with a name similar to Advanced Pharma. (D.I. 69 at 521; D.I. 71 at 746-47; DX 101)

11. Defendant spent several months selecting a name before it chose Advancis. (D.I. 71 at 737-49) Defendant wanted a name that started with "A", in keeping with the "advanced" theme. (Id. at 737, 742) In its search, defendant considered the name "Advansys," but determined that it was too close to DelSys, an existing company. (Id. at 801-05) Defendant's lawyers also conducted an investigation on the name "Advantis," the name assigned to Aventis. (Id. at 815-16) Eventually, defendant settled on the name "Advancis." (Id. at 746-48)

12. The ADVANCIS mark consists of the name ADVANCIS written in all capital letters. (DX 101) Below ADVANCIS is a line and below the line, in small capital letters, are the words PHARMACEUTICAL CORP. (Id.) The "v" in ADVANCIS is shaped like a checkmark and, above and encompassing the top of the "v," are three slanted half ovals. (Id.)

**C. Plaintiffs' and Defendant's Products and Services**

4

13.   Sanofi-Aventis is the third-largest pharmaceutical company in the world and is in the business of researching, developing, and manufacturing prescription drugs.  (D.I. 61 at 3) Plaintiffs' products cover many areas, including allergy, oncology, diabetes, and human vaccines.  (D.I. 68 at 168) Plaintiffs' most well-known products include Allegra (allergies), Taxotere (cancer), Lovenox (thrombosis), and Lantis (diabetes). (Id.; PX 9, 14, 15, and 20)  Plaintiffs have also recently launched a new product, Ketek, which is an anti-infective with a low risk of resistance.  (D.I. 68 at 154-57)

14.   Sanofi-Aventis invests billions each year in the research and development of prescription drugs.  (D.I. 51 at 3)

15.   Defendant specializes in the development and marketing of anti-infective pharmaceutical products.  (D.I. 61 at 4)  Defendant's primary technology is a drug-delivery system known as Pulsys, which increases the efficacy of a drug by delivering it to the patient in pulsatile doses.  (D.I. 71 at 738-39)  The Pulsys system releases doses in smaller time increments, as opposed to taking a pill every twelve hours, thereby killing bacteria before they can mutate and resist the hostile environment created by the antibiotic.  (Id.)  Defendant has not yet put any of its Pulsys products on the market.  (Id. at 774-75)

16.   Defendant also markets the antibiotic Keflex, the
North American rights to which defendant recently acquired from
Eli Lilly.  (Id. at 773)  At the time of trial, Keflex had not
yet been sold with the ADVANCIS name on it.  (Id. at 775)

**D.   Plaintiffs' Use Of The Aventis Mark Before And After
The Sanofi-Aventis Merger**

17.   Prior to the merger between Aventis and Sanofi-
Synthelabo, the AVENTIS mark was printed on labels, packaging,
and promotional materials along with the mark of the specific
drug.  Aventis was listed on the New York Stock Exchange ("NYSE")
as AVE.  (D.I. 68 at 324)

18.   Since the merger, AVENTIS has been used as a part
of the SANOFI-AVENTIS mark.  Aventis Pharmaceuticals, Inc.
continues to operate in the United States.  (Id. at 220-21)
There is a separate website for the U.S.-based affiliate at
www.aventis-us.com.  (Id. at 208-09; PX 57)

19.   The SANOFI-AVENTIS mark is used on business and
communication materials and signs.  (Id. at 293)  Aventis has
been de-listed from the NYSE and Sanofi-Aventis is now listed as
SNY.  (Id. at 324)

20.   Packaging for products sold in the United States
still contains the AVENTIS mark.  (Id. at 221-22)  Promotional
and advertising materials now include the SANOFI-AVENTIS mark
along with a sub-line reading "Aventis Pharmaceuticals, a member
of the sanofi-aventis Group."  (Id. at 222, 311-13; DX 79, 123)

6

All promotional materials and advertisements that carried the
AVENTIS mark prior to the merger continue to be used, rather than
destroyed. (D.I. 68 at 223-24, 288)

**E. Customers**

21. Plaintiffs' customer base consists of physicians,
patients, pharmacists, managed care customers, key opinion
leaders, and insurers. (D.I. 68 at 179-87) Plaintiffs also
target potential employees, the investment community, and
potential clinical trial participants. (Id. at 179, 188-94)

22. Because defendant's products and name are not on
the market yet, defendant's customer base primarily consists of
researchers, potential employees, and investors. (D.I. 71 at
765-71) However, with the introduction of Keflex as an Advancis
product and the potential introduction of the Pulsys system,
defendant will begin to target many of the same customers as
plaintiffs. (Id. at 773-75)

**F. Advertising**

23. Most of plaintiffs' advertising efforts are
directed to promoting their products. Plaintiffs conduct direct-
to-consumer advertising, which contains the AVENTIS name. (D.I.
68 at 198-200; PX 50) The AVENTIS name is also on the packaging
of products sold by Aventis Pharmaceuticals, Inc. (D.I. 68 at
178, 221)

7

24. Plaintiffs market their products through several media channels, including television, radio, print, and brochures left with doctors. (Id. at 195; PX 30; DX 132-34, 147) Plaintiffs also have a Sanofi-Aventis website, an Aventis U.S. website, product-specific websites, and therapeutic specialty-specific websites. (D.I. 68 at 209-13; PX 57, 59, 60)

25. Plaintiffs also market the companies through many print publications. (PX 28, 29, 32-35, 42, 43, 47) Plaintiffs conducted a short-lived corporate campaign beginning in 2002. (D.I. 68 at 195-96; PX 73, 198)

26. Plaintiffs make their name known in the medical community through their sales team that visits physicians and through sponsorships for scientific research, discussions, and conferences. (D.I. 68 at 180, 183) Plaintiffs give millions of dollars in educational grants each year. (Id. at 188)

27. During 2000-2003, plaintiffs' yearly advertising expenses were $651 million, $866 million, $932 million, and $858 million, respectively. (Id. at 214-17; PX 66) The net sales for those years were $5.5 billion, $6.4 billion, $7.3 billion, and $8.1 billion, respectively. (D.I. 68 at 214-217; PX 66)

28. Because defendant's Pulsys products are not yet on the market, defendant's advertising has consisted mainly of sponsoring research, acquiring investors, and issuing press

releases. (D.I. 71 at 765-71) Defendant also promotes its new antibiotic, Keflex. (Id. at 771)

## G. Encounters Between The Parties

29. Aventis was a limited partner in a venture capital group called Health Care Ventures. (D.I. 70 at 659-60) As a limited partner, Aventis was an investor in funds that invested in defendant when it was Advanced Pharma. (D.I. 71 at 733-34)

30. During the spring of 2001, an Aventis employee in charge of obtaining licenses for technology collaborations, John Zawad, approached Mr. Rudnic to discuss licensing its Pulsys technology to Aventis. (Id. at 754) Aventis and defendant, operating as Advanced Pharma, subsequently signed a confidentiality agreement. (Id. at 755; DX 110)

31. In May 2001, Mr. Zawad and three other Aventis employees met with Mr. Rudnic and two others from Advanced Pharma to discuss a potential collaboration. (D.I. 71 at 757; DX 111) After the meeting, the Aventis employees indicated that they needed to discuss the technology with the company's scientists in France. (D.I. 71 at 758) In August, Mr. Zawad notified Advanced Pharma that the Paris offices were closed and that they would not have word from the scientists until September. (Id. at 760) In late September and through October, defendant, which had become Advancis, and Mr. Zawad exchanged several emails and telephone calls. (Id. at 761-62)

9

32. On November 1, 2001, Mr. Zawad informed defendant that the scientists were unimpressed with the data but that the company would be willing to take a second look if more data were generated. (Id. at 762) Mr. Zawad and Mr. Rudnic encountered each other casually on a few more occasions but no collaboration between the two companies ever occurred. (Id. at 763-65)

## III. CONCLUSIONS OF LAW

### A. The Effect Of The Sanofi-Aventis Merger On Plaintiffs' Trademark Rights In AVENTIS

1. A mark is abandoned when "its use has been discontinued with intent not to resume such use." 15 U.S.C. § 1127. Three consecutive years of non-use constitutes prima facie evidence of abandonment. Id. Courts have found that the addition of a word to a trademark does not constitute abandonment. Drexel Enters., Inc. v. Richardson, 312 F.2d 525, 527 (10th Cir. 1962) ("combination of a trademark with another name does not of itself constitute abandonment"; appellant changed its name from Heritage to Heritage-Henredon); McCabe-Powers Auto Body Co. v. Am. Truck Equip. Co., 150 F. Supp. 194, 198-99 (D. Or. 1957) (trademark owner did not lose trademark rights in "American" when, after merger with American Coach, owner added name to get Powers-American).

2. Furthermore, courts have found a likelihood of confusion where the word that is likely to be confused is combined with another, completely different word. Koppers Co. v.

10

Krupp-Koppers GmbH, 517 F. Supp. 836, 844-45 (W.D. Pa. 1981)
(preliminary injunction granted due to likelihood of confusion
between Koppers and Krupp-Koppers); Frehling Enters., Inc. v.
Int'l Select Group, Inc., 192 F.3d 1330 (11th Cir. 1999)
(likelihood of confusion between Ogetti and Bell' Ogetti);
Hewlett-Packard Co. v. Packard Press, Inc., 281 F.3d 1261, 1266-
68 (Fed. Cir. 2002) (the two names "convey[ed] a similar
commercial impression" and were involved in related fields).

            3.  Defendant contends that plaintiffs have abandoned
AVENTIS through the post-merger adoption of SANOFI-AVENTIS.
Defendant further contends that there could be no likelihood of
confusion between ADVANCIS and SANOFI-AVENTIS.

            4.  The court concludes that plaintiffs have not
abandoned AVENTIS.  Based upon the evidence produced at trial,
the court finds that plaintiff still uses AVENTIS.  Aventis
Pharmaceuticals, Inc. still exists in the United States and the
AVENTIS mark is still used on packaging in the United States.
(D.I. 68 at 220-22)  Aventis Pharmaceuticals is still mentioned,
albeit as a sub-line, on new promotional materials.  (Id. at 222,
311-13; DX 79, 123)  Finally, all old packaging and promotional
materials created prior to the merger and containing the old
AVENTIS mark are still being used by plaintiffs.  (D.I. 68 at
223-24)

5. Furthermore, AVENTIS is being used as a part of SANOFI-AVENTIS. The combination of the names does not render AVENTIS abandoned, nor does it dispose of the goodwill associated with AVENTIS that was brought to the merger. (D.I. 68 at 130-31, 147-48; D.I. 71 at 918-19; PX 201); Family Circle, Inc. v. Family Circle Assocs., Inc., 205 F. Supp. 940, 942 (D.N.J. 1962) ("[W]here there has been a merger... there has through usage grown a consciousness in the purchasers' minds of these marks separately, and the desire is... to preserve such goodwill as may attach to the marks separately, perhaps to prevent others from coming along and using it by itself."). Accordingly, the court concludes that plaintiffs have not abandoned AVENTIS and that AVENTIS warrants trademark protection after the merger.

## B.   Trademark Infringement[2]

6. "The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion." Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 472 (3d Cir. 1994); Freedom Card, Inc. v. J.P. Morgan Chase & Co., 432 F.3d 463, 470 (3d Cir. 2005).

---

[2]Plaintiffs' claims for infringement, false designation of origin, statutory unfair competition, and common law unfair competition are all governed by the same standards. Chase Manhattan Bank, USA, N.A. v. Freedom Card, Inc., 333 F. Supp. 2d 239, 244 (D. Del. 2004), aff'd 432 F.3d 463 (3d Cir. 2005); Fisons, 30 F.3d at 473.

12

7. A plaintiff proves trademark infringement by demonstrating that: (1) the mark is valid and legally protectable[3]; (2) plaintiff owns the mark[4]; and (3) the defendant's use of its mark to identify goods or services is likely to create confusion concerning the origin of the goods or services. Checkpoint Sys. v. Check Point Software Tech., 269 F.3d 270, 279 (3d Cir. 2001); A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir. 2000); Fisons, 30 F.3d at 472.

## C.   Likelihood of Confusion

8. Likelihood of confusion exists when consumers viewing a mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark. Checkpoint, 269 F.3d at 280; Victoria's Secret, 237 F.3d at 211; Fisons, F.3d at 472.

---

[3]Defendant does not dispute the validity of plaintiffs' trademarks, except to the extent that it has asserted a counterclaim seeking cancellation of the marks. For the reasons discussed in the section on defendant's counterclaim, the court concludes that cancellation of plaintiffs' marks is not warranted.

[4]Defendant does not dispute that plaintiffs own the marks.

13

9.    The Third Circuit has adopted a ten-factor test to

determine likelihood of confusion in the market.[5]   These factors

are:

> (1) the degree of similarity between the owner's mark
> and the alleged infringing mark;
> (2) the strength of the owner's mark;
> (3) the price of the goods and other factors indicative
> of the care and attention expected of consumers when
> making a purchase;
> (4) the length of time the defendant has used the mark
> without evidence of actual confusion arising;
> (5) the intent of the defendant in adopting the mark;
> (6) the evidence of actual confusion;
> (7) whether the goods, competing or not competing, are
> marketed through the same channels of trade and
> advertised through the same media;
> (8) the extent to which the targets of the parties'
> sales efforts are the same;
> (9) the relationship of the goods in the minds of the
> consumers, whether because of the near-identity of the
> products, the similarity of function, or other factors;
> and
> (10) other facts suggesting that the consuming public
> might expect the prior owner to manufacture a product
> in the defendant's market, or expect a prior owner is
> likely to expand into the defendant's market.

Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1983);

Kos. Pharms., 369 F.3d at 709; Checkpoint, 269 F.3d at 280;

Victoria's Secret, 237 F.3d at 211; Fisons, 30 F.3d at 473.

10.    No single Lapp factor is determinative in a

likelihood of confusion analysis, and each factor must be weighed

_____

[5]The Third Circuit refers to these factors collectively as
the Lapp factors.  Kos Pharms. Inc. v. Andrx Corp., 369 F.3d 700,
709 (3d Cir. 2004); Checkpoint, 269 F.3d at 280; Victoria's
Secret, 237 F.3d at 211.  This ten-factor test, with minor
variations, is applied both when the underlying products compete
and when they do not compete in the marketplace.  Victoria's
Secret, 237 F.3d at 212-15.

and balanced against the others. Kos. Pharms., 369 F.3d at 709;
Checkpoint, 269 F.3d at 280.

11. The Third Circuit does not discount the strength
of one factor because of the weakness of another factor. Fisons,
30 F.3d at 476.

12. "Not all of the [Lapp] factors are present in
every case." Fisons, 30 F.3d at 476 n.11. However, if a court
finds certain Lapp factors to be inapplicable or unhelpful in a
particular case, the court should explain its choice not to
employ those factors. Kos Pharms., 369 F.3d at 711.

13. **Degree of similarity of the marks**. Degree of
similarity of the marks is the most important of the ten Lapp
factors. Kos Pharms., 369 F.3d at 712-13; Checkpoint, 269 F.3d
at 281; Victoria's Secret, 237 F.3d at 216; Fisons, 30 F.3d at
476.

14. Marks are confusingly similar if ordinary
consumers would likely conclude that two products share a common
source, affiliation, connection, or sponsorship. Kos Pharms.,
369 F.3d at 713; Victoria's Secret, 237 F.3d at 216. The proper
test is not side-by-side comparison but whether the labels create
the same overall impression when viewed separately. Fisons, 30
F.3d at 477.

15. Courts must compare the appearance, sound, and
meaning of the marks to determine their similarity. Kos Pharms.,

15

369 F.3d at 713; Checkpoint, 269 F.3d at 281; Victoria's Secret, 237 F.3d at 217-18.

16. The degree of similarity required will vary, but where goods compete directly, the necessary degree of similarity will be less. Kos Pharms., 369 F.3d at 713.

17. AVENTIS and ADVANCIS are likely to create the same overall impression among ordinary consumers. First, the words themselves are similar in their overall appearance. Both marks contain similar beginnings in that they both contain an "a" and a "v" within the first three letters. (D.I. 69 at 364) Additionally, both marks end in "is." (Id. at 363) The middle of the marks are similar because the letter "n" is four letters from the end and is preceded by a vowel and followed by a consonant. (Id. at 364; DX 192) Finally, the names are similar because both are coined words, not found in English or any other familiar language. Kos Pharms., 369 F.3d at 713 (citing Telechron, Inc. v. Telicon Corp., 198 F.2d 903, 905 (3d Cir. 1952)).

18. The marks are different in appearance, however, when viewed along with their logos and designs.[6] The AVENTIS

---

[6]The court notes the case of Avent Am., Inc. v. Playtex Prods., Inc., 68 F. Supp. 2d 920 (N.D. Ill. 1999). In Avent, the court granted a preliminary injunction, finding a likelihood of confusion between the use of AVENT and AVANCE. Prior to issuance of the preliminary injunction, the defendant objected to the magistrate judge's determination that the marks were similar based on their sound. Id. at 925. The court, noting the visual

16

mark consists of a wheat shaft, the word "Aventis" with only the
first letter capitalized, and the slogan, "Our challenge is
life." (DX 13, 33) The SANOFI-AVENTIS mark consists of "sanofi
aventis" in lower-case letters, a "smile," and a heart with
people dancing around it. The SANOFI-AVENTIS mark appears with
the slogan, "Because health matters." (DX 81) Neither of these
marks, when viewed with their designs and slogans, are similar to
the ADVANCIS mark, which consists of all capital letters and a
checkmark and half-oval design. (DX 101)

     19. Second, the marks are similar in meaning. Because
AVENTIS and ADVANCIS are coined terms, there are no dictionary
definitions for them and, therefore, they have come to be
associated with pharmaceutical companies. (D.I. 61 at 3-4; D.I.
70 at 582) Deposition and trial testimony revealed that AVENTIS
means adventure, creativity, innovation, and movement. (D.I. 69
at 458, 510) Defendant's linguistics expert testified that
ADVANCIS "puts one in mind of the word advance." (D.I. 70 at
582-83, 737) The court finds the meanings of movement,
innovation, and advancing to be very similar.

─────────

dissimilarity of the marks, rejected the defendant's argument,
concluding that the court must look to the reality of the
marketplace and consider that the consumer will not always be
able to compare the marks side-by-side and often will only hear
the mark.  Id. at 925-26.  The court also concluded that there
was a likelihood of confusion when comparing the possessive of
AVENT (AVENT'S) to AVANCE.  Id. at 926.  Due to the similarity of
the words in Avent to those in this case, the court finds Avent
persuasive.

17

20.  Finally, the marks are similar in their
pronunciation.  AVENTIS and ADVANCIS are composed of three
syllables and, in both words, primary stress is placed on the
second syllable and secondary stress is placed on the third
syllable.  (D.I. 69 at 370-72; PX 192)  The letters A, V, N, I,
and S appear in the same sequence in both words.  The marks are
also phonetically similar.  Looking to the marks in optimal mode,
or the way the words would be pronounced if spoken in isolation,
the marks share discrete speech sounds, or phonemes, which occur
in the same order.  (D.I. 69 at 365-79; PX 192)  Examining the
marks in conversational mode, or the way the words would be
pronounced in everyday conversation, the words are even closer in
sound.  (D.I. 69 at 379-88)  In conversational mode, the "a"
sound at the beginning of the words is identical, the "d" sound
in ADVANCIS drops off or disappears entirely, and a "t" sound is
often inserted before "cis."  (D.I. 69 at 376-78, 380-83, 439; PX
192)  Accordingly, the court concludes that the marks are similar
in appearance, meaning, and sound and, therefore, are highly
similar.

21.  **Strength of the owner's mark.**  Under the Fisons
test, the strength of a mark is determined by: (1) the
distinctiveness or conceptual strength of the mark; and (2) the
commercial strength or marketplace recognition of the mark.
Fisons, 30 F.3d at 478-79; Victoria's Secret, 237 F.3d at 221.

18

22.  Distinctiveness or conceptual strength of a mark is determined by placing the mark in one of four categories. Checkpoint, 269 F.3d at 282; Victoria's Secret, 237 F.3d at 221; Fisons, 30 F.3d at 479.  These four categories are: (1) generic marks, which function as the common descriptive name of a product class; (2) descriptive marks, which convey an immediate idea of the ingredients, qualities, or characteristics of the goods; (3) suggestive marks, which suggest a quality or ingredient of goods and require consumer imagination, thought, or perception to determine what the product is; and (4) arbitrary or fanciful marks, which use terms that neither describe nor suggest anything about the product, and bear no logical or suggestive relation to the actual characteristics of the goods.  Checkpoint, 269 F.3d at 282; Victoria's Secret, 237 F.3d at 221-22.

23.  In order to qualify for trademark protection, a mark must be arbitrary, fanciful, suggestive, or descriptive with a demonstration of secondary meaning.[7]  Checkpoint, 269 F.3d at 282-83; Victoria's Secret, 237 F.3d at 222.  Marks that are descriptive without secondary meaning and generic marks do not receive trademark protection.  Checkpoint, 269 F.3d at 282-83; Victoria's Secret, 237 F.3d at 222.

_____

[7]A mark is descriptive with a secondary meaning when the mark "is interpreted by the consuming public to be not only an identification of the product or services, but also a representation of the origin of those products or services." Checkpoint, 269 F.3d at 282, n.10.

19

24.   The classification system's primary purpose is to determine whether a mark is protectable.  <u>Victoria's Secret</u>, 237 F.3d at 222.  Classification of a mark can be used secondarily to determine the degree of protection a mark should receive.  <u>Id</u>. Stronger marks are entitled to greater protection.  <u>Id</u>.  A strong mark carries widespread, immediate recognition that one producer is associated with the mark and the product.  <u>Checkpoint</u>, 269 F.3d at 282 (citing <u>Versa Prods. Co. v. Bifold Co. (Mfg.)</u>, 50 F.3d 189, 202 (3d Cir. 1995)).  A mark is weak if it is used in connection with a number of different products.  <u>Victoria's Secret</u>, 237 F.3d at 222.

25.   Commercial strength or marketplace recognition is another measure of mark strength.  <u>Fisons</u>, 30 F.3d at 479. Commercial strength can be demonstrated by showing extensive advertising expenditures together with steady sales increases. <u>Victoria's Secret</u>, 237 F.3d at 224.

26.   The court concludes that AVENTIS is a strong mark. AVENTIS falls somewhere between suggestive and arbitrary. <u>Checkpoint</u>, 269 F.3d at 282 ("[s]uggestive marks are virtually indistinguishable from arbitrary marks").  The name is intended to suggest innovation and movement, and arguably could fall within the suggestive category.  However, AVENTIS is a coined term and, therefore, without context, would likely have little meaning to an ordinary consumer and would be arbitrary.  <u>Fisons</u>,

30 F.3d at 478, n.17.  Under either category, the name is

inherently distinctive and is, accordingly, entitled to a high

level of protection.  Victoria's Secret, 237 F.3d at 222.

        27.  Furthermore, AVENTIS has great commercial

strength.  During 2000-2003, plaintiffs' yearly advertising

expenses were $651 million, $866 million, $932 million, and $858

million, respectively.  (D.I. 68 at 213-16; PX 66)  The net sales

for those years were $5.5 billion, $6.4 billion, $7.3 billion,

and $8.1 billion, respectively.  (D.I. 68 at 213-16; PX 66)

        28.  AVENTIS has marketplace recognition. Plaintiffs

have been discussed in several large publications, including The

New York Times, U.S. News & World Report, The Washington Post,

Time Magazine, and The Economist.  (D.I. 68 at 217-18; PX 63)

Plaintiffs have run print and television advertisements promoting

the company name, in addition to the advertisement that comes

from inclusion of the company name in product-specific

advertisements.  (PX 28, 29, 30, 32-35, 42, 43, 47; DX 132-34,

147)  Furthermore, according to Verispan, a company that ranks

pharmaceutical performance, plaintiffs are in the top ten in

pharmaceuticals and within their claimed speciality areas.  (D.I.

68 at 182-83)  Plaintiffs have been ranked as the leading

pharmaceutical company by oncologists.  (PX 185)  Finally,

plaintiffs' financial contributions to pharmaceutical research

21

and development have earned them recognition within the medical community.  (D.I. 51 at 3)

29.  **The price of goods and other factors indicative of the care and attention expected of consumers making a purchase.** "[W]hen consumers exercise heightened care in evaluating the relevant products before making purchasing decisions, courts have found there is not a strong likelihood of confusion." Checkpoint, 269 F.3d at 284; Kos Pharms., 369 F.3d at 715.

30.  Trained professionals such as doctors, pharmacists, and nurses are expected to be knowledgeable about and to exercise care in distinguishing between different medicines; however, they are not immune from mistake.  Kos Pharms., 369 F.3d at 715-16 (citing Morgenstern Chem. Co. v. G.D. Searle & Co., 253 F.2d 390, 393 (3d Cir. 1958)).  Moreover, there is a concern that confusion regarding medications could have serious consequences for the patient.  Kos Pharms., 369 F.3d at 716.  Accordingly, the sophistication of doctors and nurses may be outweighed by the need for heightened care when it comes to protecting patients.  Id.; Checkpoint, 269 F.3d at 285 ("the standard of care to be exercised... will be equal to that of the least sophisticated consumer in the class.").

31.  The court concludes that this factor weighs slightly in favor of plaintiffs.  It is true that the doctors and pharmacists who prescribe and hand out medicines are generally

more sophisticated consumers and, in the interest of their
patients, exercise more care. However, the court finds public
policy applicable to confusion regarding products somewhat
applicable to confusion between house marks. Such confusion
could result in harm to patients.

32. Furthermore, patients must be considered as the
least sophisticated of the parties' consumers. In an age where
direct-to-consumer advertising is becoming more popular with
pharmaceutical companies, doctors and pharmacists are not the
only ones who may confront confusion. While patients may
exercise a higher level of care when it comes to their health,
the court concludes that confusion is risky. Accordingly, the
court concludes that this factor weighs slightly in favor of
plaintiffs.

33. **Actual confusion and the length of time the
defendant has used the mark without evidence of actual confusion.**
Evidence of actual confusion is not required in infringement
cases but may be highly probative.[8]  Checkpoint, 269 F.3d at 291.

---

[8]Because it was discussed at trial, the court again
addresses the question of the probative value of the Google
searches, as it did in its order dated May 5, 2005. The court
does not believe that the Google results, which at times,
directed the user to the other party's site, are probative of
actual confusion. This conclusion is supported by analogous case
law. Checkpoint, 269 F.3d at 298 (citing Duluth News-Tribune v.
Mesabi Publishing Co.,84 F.3d 1093, 1098 (8th Cir. 1996)
("misdirected communications are not evidence of confusion where
the sender knows to which party he or she wished to send his
communication but erred in the delivery of the message")).

Where a defendant has used its mark for a period of time without actual confusion, there is less of a chance of future consumer confusion. Kos Pharms., 369 F.3d at 717.

34. Plaintiff produced no evidence of actual consumer confusion at trial. However, defendant's use of its mark has been limited, because its products have not been put on the market. (D.I. 71 at 773, 775); Fisons, 30 F.3d at 476. Accordingly, the court concludes this factor weighs only slightly in favor of defendant.

35. **Defendant's intent in adopting its mark.** The relevant intent inquiry in a likelihood of confusion case is whether the defendant adopted a mark with the intent of producing confusion and appropriating the prior user's goodwill. Fisons, 30 F.3d at 479. This inquiry extends beyond asking whether a defendant purposely chose its mark to promote confusion. "The adequacy and care with which the defendant investigates and evaluates its proposed mark are highly relevant." Kos Pharms., 369 F.3d at 721.

36. The court finds that defendant was at least negligent in selecting ADVANCIS. In searching for a new name, defendant's lawyers ran a search on the ADVANTIS mark, the rights for which Aventis had paid $2 million. (D.I. 71 at 815) This investigation should have revealed the assignment of "Advantis" to Aventis and the reasons for that assignment should have been

24

further investigated.   While there is no evidence that defendant adopted the name "Advancis" with the intent to promote confusion, the court finds that defendant failed to exercise reasonable care in selecting its name.   Accordingly, this factor weighs in favor of plaintiffs.

      37.   **Channels of trade and media**.   The greater the similarity between the parties' advertising and marketing campaigns, the greater the likelihood of confusion.   <u>Checkpoint</u>, 269 F.3d at 289; <u>Kos Pharms.</u>, 369 F.3d at 722.   "This is a 'fact-intensive inquiry' that requires a court to examine the 'media the parties use in marketing their products as well as the manner in which the parties use their sales force to sell their products to consumers.'" <u>Kos Pharms</u>., 369 F.3d at 722 (quoting <u>Checkpoint</u>, 269 F.3d at 289).

      38.   The court concludes that the parties use similar advertising and marketing channels.   A large part of both parties' marketing is and will be done through their sales forces that visit doctors and pharmacists.   Additionally, both companies sponsor research, educational grants, and conferences.   (D.I. 51 at 3; D.I. 68 at 180, 183, 188; D.I. 71 at 765-71)   Finally, the parties will participate in similar direct-to-consumer marketing and, particularly through their promotions of Keflex and Ketek, will target the same constituencies.   (D.I. 68 at 198-200)

Accordingly, the court concludes that this factor weighs in favor of plaintiffs.

39. **Targets of the parties' sales efforts**. When the parties target their sales efforts to the same consumers, there is a stronger likelihood of confusion. Checkpoint, 269 F.3d at 289.

40. The court concludes that the parties target their sales efforts to the same consumers. The parties' targets consist of doctors, nurses, pharmacists, patients, clinical trial participants, and investors. (D.I. 68 at 179-94; D.I. 71 at 765-75) It is likely that users and consumers of the parties' products will come across advertisements about the other party's products. Accordingly, this factors weighs in favor of plaintiffs.

41. **The relationship of the goods in the minds of the consumers**. The test for determining the relationship of goods in the minds of consumers is whether the goods are similar enough that a consumer could assume they were associated with or offered by the same source. Fisons, 30 F.3d at 481; Checkpoint, 269 F.3d at 286. "Near-identity" and "similarity of function" are key to assessing whether consumers may see products as related. Victoria's Secret, 237 F.3d at 215. The closer the relationship between the products, the greater the likelihood of confusion. Kos Pharms., 369 F.3d at 722.

26

42. The parties are pharmaceutical companies in the business of making prescription drugs. The parties' products are sold within the same niche to the same types of consumers, and it is likely that consumers will believe the different prescription drugs offered by each company are from the other company. Checkpoint, 269 F.3d at 288. Furthermore, there is a likelihood of confusion based on both parties' production of similarly-named anti-infectives, Keflex and Ketek. (D.I. 68 at 154-57; D.I. 71 at 773-75) Accordingly, the court concludes this factor weighs in favor of plaintiffs.

43. **Weighing of the Lapp factors.** Once the court has considered each of the Lapp factors, the court must balance the factors and "determine whether in the totality of the circumstances marketplace confusion is likely." Checkpoint, 269 F.3d at 296; Kos Pharms., 369 F.3d at 711.

44. The court concludes that, under the totality of the circumstances, marketplace confusion is likely. The similarity of the marks, the most important factor in the court's analysis, weighs heavily in favor of plaintiffs. Furthermore, the strength of the mark, the relationship of the goods in the minds of the consumers, the similarity in the channels of trade and consumers targeted by the parties, and defendant's intent weigh in favor of plaintiffs. While the factor related to the price of goods and other factors indicative of consumer weighs

27

slightly in favor of plaintiffs, only two factors, actual
confusion and the length of time without actual confusion, weigh
slightly in favor of defendant.  Accordingly, the court concludes
that defendant's use of ADVANCIS is likely to create confusion
concerning the origin of goods and services.

### D.  **Plaintiffs' Federal Dilution Claim**.

45.  The Federal Trademark Dilution Act ("FTDA")
protects against "the lessening of the capacity of a famous mark
to identify and distinguish goods or services."  15 U.S.C. §
1127.

46.  In order to establish a federal dilution claim, a
plaintiff must show:

> 1.  The plaintiff is the owner of a mark that qualifies
> as a 'famous' mark in light of the totality of the
> eight factors listed in § 1125(c)(a),
> 2.  The defendant is making commercial use in
> interstate commerce of a mark or trade name,
> 3.  Defendant's use began after the plaintiff's mark
> became famous, and
> 4.  Defendant's use causes dilution by lessening the
> capacity of the plaintiff's mark to identify and
> distinguish goods or services.

Times Mirror Magazines, Inc. v. Las Vegas Sports News, 212 F.3d
157, 163 (3d Cir. 2000).

47.  In Moseley v. V Secret Catalog, Inc., 537 U.S.
418, 433 (2003), the Supreme Court held that, in order to prevail
on a claim brought pursuant to section 1127, a plaintiff must
demonstrate actual dilution.  Actual dilution can be demonstrated
through direct evidence, such as consumer surveys, but also

28

through circumstantial evidence, such as identical marks.  <u>Id</u>. at
434.  While the Supreme Court has recognized that proving actual
dilution may be difficult, the difficulty is not "an acceptable
reason for dispensing of proof of an essential element of a
statutory violation."  <u>Id</u>.

48.  The court concludes that plaintiffs have failed to
demonstrate actual dilution.  Plaintiffs did not offer consumer
surveys or any other direct evidence of actual dilution at trial.
Furthermore, plaintiffs have failed to put forth any
circumstantial evidence of actual dilution.  In their post-trial
briefing, plaintiffs contend that they demonstrated actual
dilution through testimony by their brand strategy specialist,
who testified that the ADVANCIS mark weakens associations made
with AVENTIS, and testimony by an executive, who testified that
ADVANCIS "clutters the crispness" of plaintiffs' brand image.
(D.I. 73 at 57)  The court concludes that the conjecture of these
two witnesses demonstrates a likelihood of dilution, not actual
dilution.⁹  <u>Moseley</u>, 537 U.S. at 433 ("the mere fact that
consumers mentally associate the junior user's mark with a famous
mark is not sufficient to establish actionable dilution [because]
such mental association will not necessarily reduce the capacity
of the famous mark to identify the goods of its owner").

_____

⁹Plaintiffs' branding expert went on to testify that he was
not aware of any evidence of actual dilution.  (D.I. 68 at 141)

29

49. Furthermore, while plaintiffs' and defendant's marks are similar, they are not identical. "[A] mere similarity in marks-even a close similarity-will not suffice to establish per se evidence of actual dilution." Savin Corp. v. Savin Group, 391 F.3d 439, 453 (2d Cir. 2004). Accordingly, the court concludes that defendant's use of ADVANCIS does not dilute plaintiffs' use of AVENTIS under the FTDA.

**E.    Plaintiffs' State Dilution Claim.**

50. **Preemption.** The FTDA provides that "[t]he ownership by a person of a valid registration... shall be a complete bar to an action against that person, with respect to that mark, that is brought by another person under the common law or a statute of a State and that seeks to prevent dilution of the distinctiveness of a mark, label, or form of advertisement." 15 U.S.C. § 1125(c)(3).

51. The Third Circuit has not yet addressed whether a plaintiff may proceed with a state dilution claim where the plaintiff has sought cancellation of the defendant's registered trademark. Other courts that have confronted this issue have held that, where the plaintiff seeks cancellation of the defendant's mark and is successful, the defendant loses its affirmative defense under section 1125(c)(3). Jet, Inc. v. Sewage Aeration Sys., 165 F.3d 419, 424 (6th Cir. 1999); Viacom,

30

Inc. v. Ingram Enters., Inc., 141 F.3d 886, 891 n.8 (8th Cir. 1998).

52.    The court finds the reasoning of the other courts persuasive.[10]  Having concluded that defendant's use of the ADVANCIS mark infringes plaintiffs' mark, defendant's mark will be cancelled pursuant to 15 U.S.C. § 1119, so long as defendant does not prevail on one of its defenses or on its counterclaim. Accordingly, the court will consider plaintiffs' state dilution claim.

53.    **Delaware Trademark Act**.  The Delaware Trademark Act ("DTA") provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter, or a mark valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties, or the absence of confusion as to the source of goods or services.

6 Del. C. § 3313.

54.    **Distinctiveness**.  "Proof of distinctiveness necessary to satisfy the anti-dilution statutes typically is the same proof used to show inherent or acquired distinctiveness for infringement purposes under the Lanham Act."  Barnes Group, Inc. v. Connell Ltd. P'ship, 793 F. Supp. 1277, 1304 (D. Del. 1992).

---

[10]The court notes that it is more efficient to decide this claim now, rather than requiring plaintiffs to return to litigate this claim after the court has cancelled defendant's mark in this action.

55. The court has concluded that the AVENTIS mark is inherently distinctive for the purpose of plaintiffs' infringement claims. Accordingly, the AVENTIS mark is distinctive under the DTA.

56. **Likelihood of dilution.** In order to prevail on a claim brought pursuant to the DTA, a plaintiff must demonstrate that there is a likelihood of dilution, not actual dilution. Likelihood of dilution requires "some mental association between the marks" and can be defined as a "blurring of a mark's product identification or the tarnishment of the affirmative associations a mark has come to convey." Barnes Group, 793 F. Supp. at 1304.

57. As discussed above, the court concludes that a likelihood of some mental association between the marks exists based upon the testimony of plaintiffs' witnesses. Accordingly, the court concludes that defendant's mark causes dilution pursuant to the DTA.

## F. Defendant's Defenses

58. **Laches.** Laches is one of several defenses to trademark infringement.[11] 15 U.S.C. § 1115(b). The defense

---

[11]There are generally two types of estoppel, estoppel by laches and estoppel by acquiescence. Analytic Recruiting, Inc. v. Analytic Res., LLC, 156 F. Supp. 2d 499, 515-16 (E.D. Pa. 2001). Estoppel by acquiescence applies when the trademark owner affirmatively consents to another's use of its mark. Pappan Enters., Inc. v. Hardee's Food Sys., Inc., 143 F.3d 800, 804 (3d Cir. 1998). Defendant adduced no evidence at trial of plaintiffs' affirmative consent to defendant's infringing use. Accordingly, the court will discuss only estoppel by laches.

32

serves to bar both monetary relief and injunctive relief.  Joint
Stock Soc'y v. UDC N. Am., Inc., 53 F. Supp. 2d 692, 712 (D. Del.
1999).  Laches consists of two elements: (1) inexcusable delay in
bringing suit; and (2) prejudice to the defendant as a result of
the delay.  Santana Prods., Inc. v. Bobrick Washroom Equip.,
Inc., 401 F. 3d 123, 138 (3d Cir. 2005).

        59.  Once the statute of limitations expires for a
cause of action, the defendant "enjoys the benefit of a
presumption of inexcusable delay and prejudice."  Santana, 401
F.3d at 138.  Under this presumption, the plaintiff has the
burden of proving both that delay was excusable and that it did
not prejudice the defendant.  Id. at 139.

        60.  Because the Federal Trademark Act does not contain
a specific statute of limitations, the court must look to state
law to find the statute of limitations period most analogous to
trademark infringement.  Santana, 401 F.3d at 135.  Under
Delaware law, the most appropriate time period is three years.
Joint Stock Soc'y, 53 F. Supp.2d at 713 n.18 (citing Del. C. §
8106).

        61.  Defendant contends that plaintiffs had actual
knowledge of ADVANCIS as early as 2001, when Mr. Zawad was
working with defendant, and constructive knowledge as early as
August 13, 2002, when the application for federal registration

33

was published in the Official Gazette. (D.I. 75 at 45-46)
Accepting September 2001, the date defendant's name was changed,
as the earliest date on which plaintiffs' cause of action could
have accrued,[12] the court concludes that the statute of
limitations has not expired. Plaintiffs filed suit on December
1, 2003, two years and two months after the name change.
Accordingly, the court concludes that the presumption does not
apply.

2. The court further concludes that plaintiffs' delay
was not inexcusable. Only "outrageous, unreasonable, and
inexcusable delay" bars all claims for relief; less egregious
delay bars claims for past infringement, not for prospective
injunctive relief. Univ. of Pittsburgh v. Champion Prods., Inc.,
686 F.2d 1040, 1044-46 (3d Cir. 1982).

63. The court concludes that plaintiffs' actions were
not outrageous. Defendant contends that plaintiffs' reason for
filing suit was competition, and not confusion. To demonstrate
this, defendant put forth evidence that suit was initiated
shortly before the introduction of plaintiffs' new anti-
infective, Ketek, and shortly after defendant's initial public
offering, and testimony that plaintiffs' vice president for
global competitive intelligence participated in discussions

---

[12]Defendant has put forth no evidence demonstrating that
plaintiffs were aware of the name change before it happened.

34

regarding the lawsuit. (D.I. 75 at 46) While plaintiffs may
have had competitive reasons for initiating the action when it
did, the court concludes that this does not constitute outrageous
behavior. In fact, it was reasonable for plaintiffs to initiate
suit shortly after defendant went public and received national
attention.

64. The court also concludes that defendant was not
prejudiced by the alleged delay. At the time of trial, defendant
had just acquired the rights to market Keflex and defendant still
had not placed any of its Pulsys products on the market. (D.I.
71 at 773, 775) Furthermore, at the time this suit was filed,
defendant had not made many decisions regarding branding, because
such decisions would have been premature. (Id. at 797-98)
Defendant put forth evidence at trial regarding the hardship that
would result if the court ruled in favor of plaintiffs (id. at
775-78), but this evidence does not demonstrate reliance by or
prejudice to the defendant as a result of plaintiffs' delay in
filing this action. Accordingly, the court concludes that
plaintiffs' claims are not barred by laches.

65. **Unclean hands**. The unclean hands defense requires
"convincing evidence of 'egregious' misconduct." Citizens Fin.
Group, Inc. v. Citizens Nat'l Bank, 383 F.3d 110, 129 (3d Cir.
2004). Defendant has failed to put forth evidence of any
egregious conduct on the part of plaintiffs. Defendant put forth

35

some evidence that plaintiffs may have had a competitive purpose
in filing this action but, as discussed above, plaintiffs'
actions do not constitute "clear, convincing and unequivocal
evidence that would reasonably support a finding of unclean
hands." Id., 383 F.3d at 130. Accordingly, all of defendant's
defenses fail.

## G. Defendant's Counterclaim For Cancellation Of Plaintiffs' Trademarks

66. A foreign applicant, whose country is party to a
trademark convention with the United States, must file a
statement of its bona fide intent to use along with its
application. 15 U.S.C. § 1126(d)-(e).

67. Defendant takes issue with the portion of
plaintiffs' Trademark Registration No. 2,503,413, which claims
use in connection with various goods and services, including:

House mark for a full line of pharmaceutical and
veterinary preparations; House mark for medical
diagnostic reagents for clinical or medical laboratory
use...

(D.I. 61, ex. 4 at 40)

68. Defendant also takes issue with the portion of
plaintiffs' U.S. Trademark Registration No. 2,787,832, which
claims use in connection with various goods and services,
including:

House mark for pharmaceutical preparations for use in
treatment of diseases; House mark for medical services
to medical and veterinary practitioners and
institutions, namely, advice and consultancy services

36

> in the field of the treatment and management of
> diseases, infection, disease prevention and
> diagnostics, conducting epidemiological studies for the
> medical profession; Conducting basic and applied
> research in the medical, veterinary and pharmaceutical
> fields for others...

(D.I. 61, Ex. 4 at 40-41)

69.     The court concludes that there is no evidence that
plaintiffs did not have a bona fide intent to use AVENTIS in
connection with the above-listed goods and services.[13]   To the
contrary, the evidence at trial showed that AVENTIS has been used
in connection with pharmaceuticals, veterinary medicine, animal
nutrition, chemical and plasma production, and crop science.
(D.I. 69 at 470-72)

70.     Many of the Aventis companies that made these
products have been sold or discontinued.  (D.I. 69 at 470-71)
However, plaintiffs assert, and defendant does not dispute, that
they are not required to file their statement of continuing use
yet and narrow the list of goods and services with which AVENTIS
is used.  (D.I. 61, ex. 3 at 37-38)  Accordingly, the court
concludes that cancellation of plaintiffs' trademarks is not
warranted.

**H.     Permanent Injunction**

---

[13]For the reasons discussed in section III A above, the
court also concludes that plaintiffs have not abandoned the
AVENTIS marks.

37

71. In determining whether to grant a request for a permanent injunction, the court must consider whether:

(1) the moving party has shown actual success on the merits;
(2) the moving party will be irreparably injured by the denial of injunctive relief;
(3) the granting of the permanent injunction will result in even greater harm to the defendant; and
(4) the injunction would be in the public interest.

Shields v. Zuccarini, 254 F.3d 476, 482 (3d Cir. 2001); Gucci Am., Inc. v. Daffy's, Inc., 354 F.3d 228, 236-37 (3d Cir. 2003).

72. **Success on the merits and irreparable harm to plaintiff.** "[T]rademark infringement amounts to irreparable injury as a matter of law." Gucci, 354 F.3d at 237; Pappan, 143 F.3d at 805. Here, the court has determined that defendant's use of ADVANTIS constitutes trademark infringement. Accordingly, the court concludes that plaintiffs have shown actual success on the merits and that plaintiffs would be irreparably harmed by the denial of injunctive relief.

73. **Harm to defendant.** At trial, defendant presented evidence of the harm it will suffer if the court grants a permanent injunction. This harm included legal expenses associated with a name change, a drop in share value, and costs associated with changing the name on signs, letterhead, and business cards. (D.I. 71 at 775-78) However, the court concludes that the potential harm to defendant does not outweigh

38

the harm plaintiff could suffer due to the likelihood of confusion if the court did not grant a permanent injunction.

74. **Public interest.** The public interest concern in trademark infringement cases is "the interest in the prevention of confusion, particularly as it affects the public interest in truth and accuracy." Kos Pharms., 369 F.3d at 730. "Having already established that there is a likelihood of consumer confusion created by the concurrent use of the... marks, it follows that if such use continues, the public interest would be damaged. Conversely, a prohibition upon [defendant's] use of the marks would eliminate that confusion." Optician's Ass'n of Am. v. Independent Opticians of Am., 920 F.2d 187, 198 (3d Cir. 1990). Accordingly, the court concludes that the public interest would be served by a permanent injunction.

## VI. CONCLUSION

For the reasons set forth above, the court finds for plaintiffs on all their claims, except the claim for federal trademark dilution, 15 U.S.C. § 1125(c).

The court will issue an order for a permanent injunction and cancellation of defendant's trademark. The court will certify a copy of the order to the Director of the Patent and Trademark Office pursuant to 15 U.S.C. § 1119.